## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KATHLEEN ZELASKI and DANIEL ZELASKI, her husband;** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | **Civil Case No.:** |
| : | |
| : | |
| **ZIMMER HOLDINGS, INC., and ZIMMER, INC.;** : | |
| : | **JURY TRIAL DEMANDED** |
| **Defendants.** : | |
| : | |

## CIVIL ACTION COMPLAINT

Plaintiffs Kathleen Zelaski and Daniel Zelaski ("Plaintiffs"), by their undersigned counsel, bring this Civil Action Complaint against Defendants Zimmer Holdings, Inc. and Zimmer, Inc. (hereinafter collectively "Zimmer" or "Defendants"), and allege upon personal knowledge and information and belief:

## INTRODUCTION

1.     This product liability action relates to the design, development, manufacture, testing, marketing, promotion, distribution, and/or sale of Zimmer's defective hip implant component known as the Durom Acetabular Component (the "Durom Cup").

2.     The Durom Cup was surgically implanted in Plaintiff Kathleen Zelaski's left hip on April 15, 2008. This surgery has caused Plaintiffs to suffer significant injuries, including great pain and agony that have restricted Kathleen Zelaski's ability to engage in the physical

activities she enjoys, and has affected her ability to perform her everyday responsibilities.

3.      Zimmer, founded in 1927, is one of the leading competitors in the U.S. hip and knee replacement market and accounted for seventy percent of the market in 2008.

4.      In 2008, the U.S. hip and knee replacement market was valued at $6.7 billion dollars, with the hip replacement market contributing thirty-eight percent of the market at roughly $2.5 billion dollars. According to Zimmer's 2008 Annual 10-K Report, Zimmer was number one in global market share for reconstructive hip components. In the period ending December 2008, Zimmer reported $1,279.5 million in hip component sales. Zimmer's total 2008 sales exceeded $4 billion.

5.      Zimmer designs, develops, manufactures, markets, tests, distributes and sells reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products and related orthopedic surgical products. Zimmer's related orthopedic surgical products include surgical supplies and instruments designed to aid in orthopedic surgical procedures. Zimmer also has a limited array of sports medicine products. Zimmer's primary customers include musculosketal surgeons, neurosurgeons, oral surgeons, dentists, hospitals, distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups. These customers range from large multi-national enterprises to independent surgeons.

6.      Zimmer's Durom Cup is an orthopedic device used in total hip replacement surgeries. Hip replacement surgery, also known as hip arthroplasty, is a surgical procedure in which the patient's hip joint is resurfaced or replaced with an artificial implant. It is typically used to repair joint/bone damage or to treat arthritis pain in the hip joint area. The hip joint is in essence a large ball-and-socket joint composed of two parts: the head of the thighbone, or femur; and the acetabulum, a cup-shaped bone in the pelvis. Therefore, hip replacement surgery traditionally consists of two tasks: (1) replacing the end of the femur, or thighbone, with an

artificial "ball," typically made of metal or stainless steel; and (2) resurfacing the hip socket using a metal shell and plastic liner, into which the ball attached to the femur will fit.

7.       During hip replacement surgery, damaged portions of the hip are replaced with smooth, durable artificial surfaces to allow the joint to function properly. The Durom Cup is not cemented or screwed in place during implantation. Instead, it was designed to bond to the patient's hip bone. The outside of the Durom Cup is porous, and has been sprayed with a highly engineered substance that is intended to facilitate the cup's acceptance by the human body. It is purportedly intended that the patient's own bone will grow into the exterior shell of the cup. This bone in-growth into the porous shell is what is intended to hold the cup in place.

8.       Rather than functioning in the intended manner, the design of the Durom Cup implant inhibits bone growth and as a result, instead of adhering to the bone, it comes loose and/or pops free from the hip, which can cause damage to the pelvic bone. This unintended result causes extreme and devastating pain and necessitates revision surgery to remove the failed Durom Cup and replace it with a product that functions properly.

9.       The Durom Cup is part of a metal-on-metal hip implant system, which was widely sold as being more durable, especially in young and active patients.

10.       According to an article published in the *New York Times*, on Thursday March 4, 2010, entitled, "Concern Over Metal-on-Metal Implants", "studies in recent years indicate that in some cases the devices can quickly begin to wear, generating high volumes of metallic debris that is absorbed into a patient's body. That situation can touch off inflammatory reactions that cause pain in the groin, death of tissue in the hip joint and loss of surrounding bone." In Kathleen Zelaski's case, she, like the other patients in the studies, may have suffered from metal debris causing death to the soft tissue and bone surrounding her hip, and further decreasing her chances for a successful second hip replacement.

11.    The suspension of the sales of Zimmer's Durom Cup, announced on July 22, 2008, affects thousands of patients. The Durom Cup has been implanted in over 12,000 patients in the United States since it was first sold on the U.S. market in 2006.

12.    When introducing the Durom Cup, Zimmer represented that the Durom Cup would provide greater range of motion and less wear on the bearing than traditional hip implant components, thus making it an ideal product for younger, active patients. Contrary to Zimmer's representations, the Durom Cup is prone to an unprecedented failure rate.

13.    Since Defendants first began selling the Durom Cup in the United States in 2006 through on or about July 22, 2008, the product labeling and product information for the Durom Cup failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the Durom Cup can loosen and separate from the acetabulum (hip socket) in patients.

14.    Despite their knowledge of the serious injuries associated with use of the Durom Cup, Defendants engaged in a marketing and advertising program which, as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Durom Cup was safe.

15.    At all relevant times, Zimmer knew or should have known that the Durom Cup was not safe for the patients, in whom it was implanted, including Plaintiffs, because of the unacceptable failure rate, which is approximately 24%, according to one leading hip surgeon.

16.    Notwithstanding the knowledge of predicted failures with the defective Durom Cup, Zimmer continued to sell the Durom Cup for implantation in patients until July 22, 2008, when Zimmer announced a suspension of the sale and distribution of the Durom Cup.

17.    Plaintiffs and patients in whom the Durom Cups remain implanted, not only have suffered physical injuries, they also bear an unacceptable increase in the risk of severe pain and

disability, with or without a costly and painful revision surgery. The revision surgery is invasive and painful and is often needed to replace the defective Durom Cup implant, as it was here.

**PARTIES**

### I. PLAINTIFFS

18.     Plaintiff Kathleen Zelaski is over the age of majority and is a citizen and resident of Birmingham, Alabama.

19.     Plaintiff Daniel Zelaski is, and at all relevant times has been, the lawful spouse of Kathleen Zelaski and resides at the same address as his wife.

20.     Plaintiffs Kathleen Zelaski and Daniel Zelaski have been injured due to the defective medical prosthesis manufactured and/or sold by Defendants.

### II. DEFENDANTS

21.     Defendant Zimmer Holdings, Inc. is a Delaware corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana, 46580-2746. At all relevant times, Zimmer Holdings, Inc. has been a publicly traded holding company with wholly owned subsidiaries that designed, manufactured, marketed, supplied and sold to distributors, physicians, hospitals, patients and medical practitioners certain hip socket devices known as the Durom Cup to be surgically implanted in patients throughout the United States, including in the State of Alabama.

22.     Defendant Zimmer, Inc. is a Delaware corporation with its principal place of business at 1800 West Center Street, Warsaw, Indiana, 46581-0708. At all times relevant, Zimmer, Inc. was a wholly owned subsidiary of Defendant Zimmer Holdings, Inc.

23.     At all times relevant, Defendant, Zimmer, Inc. was duly organized and existing under the laws of the State of Delaware with its principal place of business for manufacturing the

Durom Cup in Warsaw, Indiana. Defendant, Zimmer, Inc. designed, manufactured, marketed, supplied and sold the Durom Cup to physicians, hospitals, and clinics to be surgically implanted in patients in the State of Alabama.

24.     At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant. During the relevant times, Defendants possessed a unity of interest between themselves and Zimmer exercised control over its subsidiaries and affiliates. As such, Defendants are each individually, as well as jointly and severally, liable to Plaintiffs for Plaintiffs' injuries, losses and damages.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

26.     Venue in this action properly lies in the Northern District of Alabama pursuant to 28 U.S.C. §§ 1391 (a) and (c), as a substantial number of the events, actions or omissions giving rise to Plaintiffs' claims occurred in this District. At all times material hereto, Defendants conducted substantial business in the State of Alabama.

27.     Venue in this action also properly lies in the District of New Jersey pursuant to Case Management Order No. 2 in *IN RE: Durom Hip Cup Products Liability Litigation*, MDL No. 2158 (Master Docket No. 09-4414(SDW)(MCA)).

28.     Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in Alabama, through its employees, agents and/or sales representatives, and derived substantial revenue from such business.

29.     At all relevant times, Defendants placed the defective device into the stream of

interstate commerce that was implanted in Kathleen Zelaski.

30.     Defendants are conclusively presumed to have been doing business in this state and are subject to Alabama's long arm jurisdiction.

31.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of Alabama.

32.     Plaintiffs' damages in this matter accrued in the Northern District of Alabama.

## FACTUAL ALLEGATIONS

### I. BACKGROUND ON ARTIFICIAL HIPS AND HIP REPLACEMENT DEVICES

33.     The human hip joint consists of two parts: a ball and a socket. A portion of the pelvic bone forms a cup-shaped socket; the ball at the top of the thigh bone fits into it. The ball is surrounded with cartilage which, in a healthy hip joint, allows the ball to move smoothly within the socket. Conditions such as osteoarthritis and avascular necrosis can cause degeneration of the hip joint such that hip replacement is required. A hip implant is designed to replicate the human anatomy — that is, the relatively simple ball and socket structure of the human hip joint. Total hip replacement surgery involves implanting an artificial ball and socket into the patient.

34.     The artificial hip implantation process requires a surgeon to insert a metal cup with a smooth lining into the patient's diseased pelvic socket. The lining serves the same purpose as natural cartilage: allowing for smooth movement of the ball portion of the thigh bone. The diseased or degenerated ball part of the thigh bone is then removed and replaced by a metal or sometimes ceramic ball mounted onto a thin metal stem. The metal stem is then fit into the thigh bone. Finally, the ball is placed securely into the pelvic socket that has been fitted with the artificial metal cup, where it should move easily, without friction or pain to the patient.

35.     Total hip replacement is most commonly used to treat joint failure caused by osteoarthritis. Other indications include rheumatoid arthritis, avascular necrosis, traumatic arthritis, protrusion acetabuli, certain hip fractures, benign and malignant bone tumors, arthritis associated with Paget's disease of the bone, ankylosing spondylitis and juvenile rheumatoid arthritis. The aims of the procedure are pain relief and improvement in hip function. Hip replacement is usually considered only once other therapies, such as pain medications, have failed.

36.     Total hip arthroplasty ("THA"), or total hip replacement, is a common medical procedure performed on more than 420,000 patients in the U.S. each year. It is designed to help relieve pain and improve joint function in people with severe hip degeneration due to arthritis or trauma. Traditional devices to replace degenerative hips utilize implantable metal or ceramic heads fitting into a modular metal-backed polyethylene bearing. One concern that historically plagued successful THAs was the wear of the bearing surface. As the THA became more common among younger patients who wanted to maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked polyethylene, ceramic-on-ceramic and metal-on-metal were developed to address the issue of wear. The Durom Cup promised to offer an alternative surface that would resist wear and tear.

37.     The Durom Cup is a monoblock (constructed of a single piece of material) cup made of cobalt-chromium (CoCr) alloy and is designed for use in combination with Zimmer's Metasul Metal-on-Metal Tribological Solution LDH (Large Diameter Heads) for THA. The design and material of the Durom Cup are key elements to its intended stability, wear resistance, and bone sparing characteristics. The Durom Cup has a pure titanium plasma-sprayed coating for fixation. The coating on the Durom Cup sold in the United States has a different structure and is slightly thicker (0.1mm) compared to the same products which were sold for use in patients

outside of the United States.

## II. **HISTORY OF THE DUROM CUP**

38.     The Durom Cup was launched in Europe in 2003 for hip resurfacing. Hip resurfacing requires less bone removal than conventional THA, but necessitates a different surgical technique. The Durom Cup was made available in Canada and Australia in 2003, India and Korea in 2005, and Argentina in 2006.

39.     On or about December 19, 2005, Zimmer submitted a section 510(k) Premarket Notification of Intent (K053536) to the FDA to manufacture and market the Durom Acetabular Component and the Metasul LDH (Large Diameter Heads) devices to the public. Three months later, on March 19, 2006, the FDA cleared the device for marketing and distribution in the United States.

40.     The 510(k) approval process by the FDA is regarded as a simplified "me too" application process, which does not require extensive review and approval by the FDA. A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is substantially equivalent to a legally marketed device. Submitters simply must compare their device to one or more legally marketed devices and make and support their substantial equivalency claims. The FDA does not perform 510(k) pre-clearance facility inspections and submitters may market the device immediately after 510(k) clearance is granted.

41.     In this instance, Zimmer submitted a simplified 510(k) application that compared the Durom Cup to earlier products called "predicate devices" manufactured by competitors. In its application, Zimmer described: "The proposed device has the same intended use, has similar performance characteristics, is manufactured from similar materials using similar processes, and is similar in design to the predicate devices."

42.     No clinical studies were conducted in connection with the submission of the 510(k) application for the Durom Cup. Instead, as part of the application process, Defendants stated that the "results of non-clinical analysis demonstrate that the device is safe and effective and substantially equivalent to the predicate device (as implants)." Further, in their submission to the FDA, Defendants repeat throughout that the Durom Cup is intended to be a device that is substantially similar to previously approved predicate devices. Therefore, the FDA was persuaded by Defendants that any additional review and investigation was unnecessary.

## III.  DESIGN & MANUFACTURE OF THE DUROM CUP

43.     Zimmer's Durom Cup is a flattened hemisphere, which is meant to offer a greater range and freedom of movement. With a constant wall thickness of 4 mm throughout all sizes, the cup maintains an inner diameter as large as possible, while intending to maintain maximum implant strength and minimum bone resection of acetabular bone mass. A coating of pure titanium using a plasma spray under vacuum and static load is applied to the outer surface, called Porolock (tm) Ti VPS. The high carbon cobalt-chromium (CoCr) alloy is produced by a forging rather than casting process. This means that the size of block carbides is up to eight-times smaller compared to cast cobalt-chromium (CoCr) prostheses. The resulting lower surface roughness was intended to lead to a lower wear rate when compared with cast cobalt-chromium (CoCr) alloys.

44.     Zimmer failed to recognize the deficiencies of the Durom Cup due to poor and inadequate quality assurance procedures, including failure of Zimmer to implement appropriate physical, manual, x-ray, microscopic and other inspections of the Durom Cup. Zimmer failed to implement or utilize adequate safeguards, tests, inspections, monitoring and quality assessments

to ensure safety of the defective device. At the time the devices were manufactured and sold to patients, the devices were defectively manufactured and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to risks of injury.

45.   During the time Zimmer manufactured the Durom Cup, inadequate manufacturing processes led to material flaws in the quality systems at its manufacturing facilities.

46.   During the course of manufacturing the Durom Cup, Zimmer failed in several ways, including, without limitation, by:

(a)   failing to conduct adequate mechanical testing on components, subassemblies and/or finished Durom Cup;

(b)   failing to test an adequate number of sample devices on an ongoing basis;

(c)   failing to take adequate steps to specifically identify failure modes with clarity and suggest methods to monitor, avoid, and/or prevent further failures;

(d)   failing to identify and/or note the significance of any testing that resulted in failure of the Durom Cup;

(e)   failing to take corrective actions to eliminate or minimize further failures of the Durom Cup;

(f)   failing to adequately explain performance specifications for the components, subassemblies, and finished Durom Cup;

(g)   failing to adequately explain or justify all test conditions and acceptance criteria for the Durom Cup;

(h)   failing to perform adequate testing in an environment that

adequately simulated in vivo conditions; and

(i)    failing to perform adequate quality assurance testing before and after sterilization.

47.    Zimmer failed to perform adequate testing of the Durom Cup, including its components and subassemblies, to ensure that the Durom Cup functioned properly during and after implantation.

48.    As a result of these manufacturing and quality control problems associated with the manufacture of the Durom Cup, the component was inadequately and defectively manufactured, making it adulterated, and outside of the specifications expressly approved by the FDA.

## IV. DUROM CUP DEFECTS ARE EXPOSED BY LEADING PHYSICIANS

49.    After the FDA initially approved the 510(k) application, Zimmer began to aggressively market the Durom Cup to physicians.

50.    Relying upon Zimmer's representations, physicians began using the Durom Cup instead of other models. Reports of Durom Cup failures soon followed. It is now apparent that a significant percentage of the Durom Cups have failed, and that the failure rate is unacceptably high.

51.    The failure rate is estimated at upwards of 24% (twenty-four percent) when analyzing patients over a four-year period (2006-2010). This failure rate is much higher than similar products made by Zimmer, and is also much higher than the failure rate of competitor's devices. Furthermore, this rate is four times Zimmer's predicted failure rate of 5.7%

52.    Lawrence Dorr, M.D., a world-renowned orthopedic surgeon and Zimmer consultant, and a team of doctors at The Arthritis Institute at Good Samaritan Hospital in Los Angeles, California, have recently published the results of their study comparing one hundred

and eighty patients who had the large-diameter (44- to 50-mm) Durom Cup and fifty-four

patients who had a small-diameter (28-mm Metasul®) articulation implanted between May 2006

and November 2007. The total number of clinical failures was forty-one of one hundred and

eighty patients (23%). Twenty-eight of one hundred and fifty-one patients had radiographic

impending failure at final follow-up (18.5%). All post-revision surgery retrieved cups were

examined in detail and had no evidence of bone on the fixation surface.

53.     Since at least 2007, surgeons implanting the Durom Cup complained to Zimmer

that the device was failing in their patients, many of whom had to undergo painful, invasive and

expensive revision surgeries.

54.     One of these surgeons was Dr. Dorr, who warned Zimmer in 2007 of the high rate

of Durom Cup failures. At the time Dr. Dorr warned Zimmer of the high rate of failures, he was

a veteran of thousands of hip replacement surgeries.

55.     In particular, Dr. Dorr informed Zimmer that x-rays showed that the Durom Cup was

failing because it was separating or loosening from the bone, rather than fusing to it, causing patients

crippling pain while the metal cup moved around the hip socket and rubbed against the bone.

56.     Zimmer ignored Dr. Dorr's warnings and continued to sell the Durom Cup.

57.     In April 2008, Dr. Dorr publicly warned other orthopedists about the cup

failures his patients were experiencing and urged Zimmer to stop selling the Durom Cup.

58.     On April 22, 2008, Dr. Dorr wrote the following memorandum to his

colleagues at the American Association of Hip and Knee Surgeons:

*MEMO*

*DATE: 4/22/08*

*TO: American Association of Hip and Knee Surgeons*

*FROM: Larry Dorr, M.D.*

RE: *This NOTICE is to inform you that we have had ten revisions in 165 hips and have four more that need to be revised using the Durom cup (Zimmer, Inc.).*

*This **failure rate** has occurred within the first two years. In the first year the x-rays looked perfect. We have revised four that did not have any radiolucent lines or migration (and John Moreland revised one). These early cups fooled us, but the **symptoms were so classic for a loose implant** that we operated the patients. When we hit on the edge of the cup **it would just pop free.** As time goes by the cups begin developing radiolucent lines. We now have one cup at two years that has actually migrated a short distance. It has tilted into varus. **We do not believe the fixation surface is good on these cups.** Also there is a circular cutting surface on the periphery of the cup that we believe **prevents the cup from fully seating. We stopped using the cup after the first revisions.***

*We have notified Zimmer. **The FDA has been notified** and we will notify them of our continued revisions. The company does not believe it should pull the cup from the market so I am notifying all of my colleagues of our failure rate with this cup. I went through a similar scenario with the Sulzer cup failures where I was the only one experiencing revisions at the beginning and basically it was assumed that it was our technique. **I can assure you that this goes beyond technique.** I learned my lesson in not informing everyone about **this magnitude of failures** with the Sulzer cup problem, so it is my obligation to do so with this cup.*
(emphasis in original).

59.    After informing colleagues about his experience with the Durom Cup, Dr. Dorr heard from several other doctors who reported similar problems. According to Dr. Dorr and other physicians, x-rays of patients who received defective Durom Cups showed that the socket was separating from bone, rather than fusing with it.

60.    For patients, the slippage of the implant itself as a result of its failure to adhere to the bone meant agony as the metal cup moved around in the hip socket and rubbed against bone. Such crippling injuries are devastating to patients.

61.    Despite this memorandum, Zimmer again ignored the warnings and continued to sell the Durom Cup.

62.    In late May 2008, Zimmer finally informed surgeons that it was investigating Dr. Dorr's complaint but that it did not suspend sales, as Dr. Dorr had recommended. While Zimmer investigated complaints, roughly 1,300 more patients were implanted with the Durom Cup in the

United States.

63.     Zimmer responded to criticisms by defending the Durom Cup and blaming the doctors' implantation techniques. Zimmer later attributed failures of the Durom Cup to a discrepancy in doctors' techniques in performing THA surgeries. Zimmer contended (and still contends) that the technology and design parameters of the Durom Cup demand a surgical technique with "high precision and specificity compared to more common and familiar hip arthroplasty surgical techniques practiced in the U.S." Therefore, according to Zimmer, the Durom Cup requires additional training in implantation technique and cup placement for many surgeons who use the device and who may otherwise be experts in THA.

64.     Around this time, although Zimmer still maintained that there were no issues with Durom Cup, other doctors stopped implanting them. Even still, Zimmer continued to market the Durom Cup to unsuspecting physicians and patients, selling hundreds of units between May 2008 and July 22, 2008.

65.     Throughout 2008, while the Durom Cup was being implanted in patients across the United States and around the world, Zimmer was accumulating mounting and overwhelming reports that the Durom Cups were failing at an alarming and undisclosed rate.

## V. TEMPORARY SUSPENSION OF THE DUROM CUP

66.     Zimmer continued to sell the Durom Cups for implantation in patients until July 22, 2008, when Zimmer announced it was temporarily suspending the Durom Cups from marketing and distribution in the United States. In its announcement, Zimmer stated that the suspension was necessary "while the Company updated labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S."

67.     Zimmer announced that the company was taking this "voluntary action to address

its concerns regarding reports of cup loosening and revisions of the acetabular component used in

total hip replacement procedures" but that Zimmer "has found no evidence of a defect in the

materials, manufacture, or design of the implant."

## VI. ZIMMER'S IMPROPER FAILURE TO RECALL DUROM CUP

68.    Under federal regulations, a recall is "a firm's removal or correction of a

marketed product that the Food and Drug Administration considers to be in violation of the laws

it administers and against which the agency would initiate legal action, e.g., seizure." A recall is

an effective method of removing or correcting consumer products that are in violation of laws

administered by the FDA.

69.    These federal regulations also recognize that recall is an alternative to an

FDA-initiated court action for removing or correcting violative products by setting forth

specific recall procedures for the FDA to monitor recalls and for the FDA to assess the

adequacy of a firm's efforts in recall. A company's voluntary recall of a medical device and

the FDA's classification of that action as a Class I recall establish that the device violates

FDA regulations.

70.    To date, Zimmer has not issued a public recall of the Durom Cup and instead

has described its action as only a "temporary suspension" of the device. In reality, Zimmer

has made the device "unavailable for purchase in the United States," but has not voluntarily

recalled the device.

## VII. PLAINTIFFS' INJURIES DUE TO THE DEFECTIVE DUROM CUP

71.    Plaintiffs have been significantly injured due to the implantation of the

Durom Cup in Kathleen Zelaski's left hip. As a result of the Durom Cup's failure, the

Plaintiff and her family have had to adjust their lives to accommodate her ongoing injuries.

72.    Plaintiffs' expectation following implant surgery was that Kathleen Zelaski

would need only a minimal recovery period following surgery and that the implanted hip would last 15-20 years. Plaintiffs expected a significant improvement in her quality of life after the initial hip replacement surgery, which did not occur and continues to impact Mrs. Zelaski physically.

73.    Since approximately, late 2013, Mrs. Zelaski has been diagnosed with elevated ion levels and increased pain associated with her left hip implant.  Her surgeon continues to monitor the ion levels with expectation that revision surgery will be needed if levels continue to increase.

74.    As a result of the defective Durom Cup hip implant, the Plaintiffs' well-being has suffered.  Plaintiffs have suffered expended money and expect to continue to suffer these losses and damages into the future.

## CLAIMS FOR RELIEF

## COUNT I

## (Strict Liability – Failure To Warn And Instruct)

75.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

76.    At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of the Durom Cup. Defendants designed, manufactured, assembled and sold the Durom Cup to medical professionals and patients knowing that they would then be implanted in patients in need of hip prosthesis.

77.    Defendants distributed and sold the Durom Cup in the condition in which it left its place of manufacture, in its original form of manufacture, which included the defects described herein. The Durom Cup was expected to and did reach Plaintiffs without substantial change or adjustment in its condition as manufactured and sold by Defendants.

78.    The Durom Cup designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendants was in a dangerous and defective condition and posed a threat to any user or consumer of the Durom Cup. The defect existed in the Durom Cup at the time it was purchased and implanted into Plaintiff, Kathleen Zelaski.  Mrs. Zelaski was and is in a class of persons that Defendants should have considered to be subject to the harm caused by the defective nature of the Durom Cup.

79.    The defective Durom Cup was expected and did reach Mrs. Zelaski without substantial change in condition. The Durom Cup was implanted and used in the manner for which it was intended. This use has resulted in severe physical and other injuries to Plaintiffs due to the defectiveness of the device.

80.    Defendants knew or should have known through testing, adverse event reporting, or otherwise, that the Durom Cup created a high risk of bodily injury and serious harm.

81.    Defendants failed to provide adequate and timely warnings or instructions regarding the Durom Cup and its known defects. Defendants failed to advise patients like Plaintiffs that monitoring of the cup was necessary to avoid long and painful period, where the device failure would go undetected – as it did here.

82.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages. As a direct result, Plaintiffs expended money and will continue to expend money for medical bills and expenses. Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

## COUNT II

### (Strict Liability – Design Defect)

83.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

84.    Zimmer is the manufacturer and/or supplier of the Durom Cup and placed this device into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Durom Cup.

85.    The Durom Cup manufactured, marketed, distributed and/or supplied by Zimmer was defective in design or formulation in that, when the medical device left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

86.    The Durom Cup was expected to and did reach Plaintiffs without substantial change in condition. Alternatively, the Durom Cup manufactured and/or supplied by Defendants was defective in design or formulation, because when the Durom Cup device left the hands of Defendants, the manufacturers and/or suppliers, the Durom Cup was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

87.    The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, and the Medical Devices Amendment thereto (hereafter "FDCA"). The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

88.    The Durom Cup manufactured and/or supplied by Zimmer was defective due

to inadequate warnings and/or inadequate trials, testing and study, inadequate exposure of the real risks inherent with the drug as determined by the clinical trials, and inadequate reporting of the results of the clinical trials and post-marketing clinical experiences with the device.

89.     The Durom Cup manufactured and/or supplied by Zimmer was defective due to inadequate post-marketing warnings or instructions because, after Zimmer knew or had reason to know of the risk of injury from the Durom Cup, it failed to provide adequate warnings to the medical community, patients, and the public, including Plaintiffs, and continued to promote and advertise the Durom Cup as safe and effective.

90.     The Durom Cup was designed, manufactured, distributed, tested, sold, marketed, and advertised defectively by Zimmer. As a direct and proximate cause of Zimmer's defective design of the Durom Cup, Mrs. Zelaski and other patients had the device implanted in their bodies, and suffered and will continue to suffer increased risk of long-term complications and pain and additional surgeries, personal injuries, the need for corrective surgery, and pain and suffering.

91.     Zimmer was or should have been in possession of evidence demonstrating that the Durom Cup caused serious injuries and would fail. Nevertheless, Zimmer continued to market the device by providing false and misleading information with regard to the safety and efficacy of the Durom Cup.

92.     Zimmer's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiffs, other patients and the public.

93.     As a result of Zimmer's conduct, Plaintiffs suffered losses, injuries and damages specified herein.

## COUNT III

### (Strict Liability – Manufacturing Defect and Failure to Adhere to Quality Controls)

94.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

95.   The Durom Cup is defectively manufactured because the foreseeable risks of mechanical malfunction and failure outweigh the benefits associated with the Durom Cup.

96.   The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, and the Medical Devices Amendment thereto (hereafter "FDCA"). The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

97.   The Durom Cup was expected to and did reach the Plaintiffs without substantial change or adjustment to its mechanical function.

98.   Defendants knew or should have known of the manufacturing defects and the risk of serious bodily injury that exceeded the benefits associated with the Durom Cup.

99.   Furthermore, the Durom Cup and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

100.   The Durom Cup was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Durom Cup created a high risk of bodily injury and serious harm. Defendants failed to adequately and timely warn consumers of this risk.

101.   The Durom Cup is inherently dangerous for its intended use due to a manufacturing defect or defects and improper functioning. Defendants are therefore strictly liable to Plaintiffs for their breach of duty to Plaintiffs.

102.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory damages in an amount to be proven at trial.

## COUNT IV

### (Negligence)

103.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

104.    At all relevant times, Defendants had a duty and continue to owe a duty to Plaintiffs to provide a safely manufactured product, to notify the FDA of flaws, and to warn the FDA and Plaintiffs of the defective nature of the Durom Cup.

105.    Defendants breached their duty of reasonable care to Plaintiffs by defectively designing, manufacturing, and/or negligently failing to warn of these defects in the Durom Cup, thereby causing Plaintiffs' injuries and damages.

106.    Defendants breached their duty of reasonable care to Plaintiffs by manufacturing and assembling the Durom Cup in such a manner that it was prone to failures and malfunction and thus exposed Plaintiffs to severe and lasting physical trauma and injuries.

107.    Defendants breached their duty of reasonable care to Plaintiffs by failing to promptly and adequately notify the FDA and warn and instruct Plaintiffs, the medical community, and the public at the earliest possible date of known defects in the Durom Cup.

108.    Defendants breached their duty of reasonable care to Plaintiffs by failing to exercise due care under the circumstances.

109.    As a direct and proximate result of Defendants' wrongful misconduct,

Plaintiffs have sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT V

### (Negligence *Per Se*)

110.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

111.   Defendants have an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Durom Cup, and otherwise distributing the Durom Cup.

112.   Defendants' acts and omissions constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331(a) and 333(a)(2), and constitute a breach of duty subjecting Defendants to civil liability for all damages arising therefrom, under theories of negligence *per se*.

113.   Plaintiffs, as purchasers of the Durom Cup, are within the class of persons the statutes and regulations (described above) are designed to protect and Plaintiffs' injuries are the type of harm these statutes and regulations are designed to prevent.

114.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VI

### (Breach Of Implied Warranty)

115.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

116.    Defendants impliedly warranted that the Durom Cup, which Defendants designed, manufactured, assembled, promoted and/or sold to Plaintiffs and Mrs. Zelaski's physicians, was merchantable and fit and safe for ordinary use.

117.    Defendants further impliedly warranted that the Durom Cup, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiffs and Mrs. Zelaski's physicians, was fit for the particular purposes for which it was intended and was sold.

118.    Contrary to these implied warranties, the Durom Cup was defective, unmerchantable, and unfit for its ordinary use when sold, and unfit for the particular purpose for which it was sold.

119.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VII

### (Breach Of Express Warranty)

120.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

121.    Defendants expressly warranted to Plaintiffs by and through Defendants and/or their authorized agents or sales representatives, in publications, package inserts, the

internet, and other communications intended for physicians, patients, Plaintiffs, and the general public, that the Durom Cup was safe, effective, fit and proper for its intended use.

122.    In allowing the implantation of the Durom Cup, Plaintiffs and Mrs. Zelaski's physician relied on the skill, judgment, representations, and express warranties of Defendants. These warranties and representations were false in that the Durom Cup was not safe and was unfit for the uses for which it was intended.

123.    Through sale of the Durom Cup, Defendants are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

124.    Defendants breached their warranty of the mechanical soundness of the Durom Cup by continuing sales and marketing campaigns highlighting the safety and efficacy of their product, while they knew of the defects and risk of product failure and resulting patient injuries.

125.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VIII

### (Negligent Misrepresentation)

126.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

127.    At the time Defendants manufactured, designed, marketed, sold and distributed the Durom Cup for use by Plaintiffs, Defendants knew or should have known of the use for which the Durom Cup was intended and the serious risks and dangers associated

with such use of the Durom Cups.

128.     Defendants owed a duty to treating physicians and to the ultimate end-users of the Durom Cup, Plaintiffs, to accurately and truthfully represent the risks of the Durom Cup. Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiffs' physicians, the medical community, Plaintiffs, and the public about the risks of the Durom Cup, which Defendants knew or in the exercise of diligence should have known.

129.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory damages in an amount to be proven at trial.

## COUNT IX

## (Intentional Misrepresentation)

130.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

131.     Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote and sell the Durom Cup, owed a duty to provide accurate and complete information to Plaintiffs, Mrs. Zelaski's physicians, and the public regarding the Durom Cup.

132.     However, Defendants misled Plaintiffs, their physicians, and the public into believing that the Durom Cup was safe and effective for use in hip replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince health care professionals and patients to use the Durom Cup, even though Defendants knew or should have known that the Durom Cup was unreasonably unsafe. Defendants also failed to warn health care professionals and the public about the safety risks

of the Durom Cup and the Metasul implant system they designed, marketed and sold.

133.    Defendants' advertising program and promotional items, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the Durom Cup was safe for human use, had no unacceptable side effects, and would not interfere with daily life.

134.    Defendants purposefully concealed, failed to disclose, misstated, downplayed and understated the health hazards and risks associated with the use of the Durom Cup. Defendants, through promotional practices as well as the publication of medical literature, deceived potential treating physicians, Plaintiffs, other patients, and the public. Defendants falsely and deceptively kept relevant information from potential treating physicians, the FDA and the general public, including Plaintiffs, regarding the safety of the Durom Cup.

135.    Defendants expressly denied that the Durom Cup created an increased risk of injury and took affirmative steps to prevent the discovery and dissemination of any evidence on the increased likelihood of injury from the Durom Cup.

136.    Defendants did not accurately report the results of adverse events by fraudulently and intentionally withholding from the FDA, physicians, Plaintiffs, and the public, the truth regarding Durom Cup failures for months, if not years, all the while undertaking a major advertising campaign to sell the Durom Cup. Defendants received reports of the Durom Cup defects from various sources, including Dr. Dorr, and intentionally withheld this information, while continuing to sell the Durom Cup for implantation in individuals such as Kathleen Zelaski.

137.    Further, even as Defendants disclosed some information regarding the Durom Cup defects, the disclosures were incomplete and misleading.

138.    Defendants effectively deceived and misled the scientific and medical

communities regarding the risks and benefits of the Durom Cup. The truth did not begin to emerge until, at the earliest, May 2008 when Zimmer issued a "Dear Doctor" letter to physicians that suggested that Durom Cup defects were arising because of doctors' surgical techniques. This letter was inadequate and failed to fully inform physicians, patients, including Plaintiffs, and the public of the true defects in the Durom Cup, defects that were known to Defendants. Even after the letter, Defendants' sales representatives continued to assure physicians and patients that the Durom Cup was adequate and reliable for the purpose intended and continued to sell the Durom Cup.

139.    Through the materials they disseminated, Defendants falsely and deceptively misrepresented or omitted a number of material facts regarding the Durom Cup.

140.    Defendants possessed evidence demonstrating the Durom Cup caused serious adverse side effects. Nevertheless, Defendants continued to market the Durom Cup by providing false and misleading information with regard to its safety to Plaintiffs and Mrs. Zelaski's treating physicians.

141.    Defendants engaged in all the acts and omissions described above with the intent that Plaintiffs' physicians and Plaintiffs would rely on the misrepresentation, deception and concealment in deciding to use Defendants' Durom Cup rather than another Zimmer product or a competitors' similar product.

142.    Plaintiffs and Mrs. Zelaski's physicians justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations as set out above. This reliance proximately caused the injuries and damages described in this Complaint.

143.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs sustained and will continue to sustain severe physical injuries, economic losses and other damages for which they are entitled to compensatory damages and in an amount to be

proven at trial.

## <u>COUNT X</u>

### <u>(Constructive Fraud)</u>

144.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully

set forth herein.

145.    At the time Defendants sold the Durom Cup to Plaintiffs, Defendants were in

a unique position of knowledge concerning the safety and effectiveness of the Durom Cup,

which knowledge was not possessed by Plaintiffs or Mrs. Zelaski's physicians, and

Defendants thereby held a position of superiority over Plaintiffs.

146.    Through their unique knowledge and expertise regarding the defective nature

of the Durom Cup, and through their statements to physicians and their patients in

advertisements, promotional materials, and other communications, Defendants professed to

Plaintiffs that they had knowledge of the truth of the representation that the Durom Cup was

safe and effective for its intended use and was not defective.

147.    Defendants' representations to Plaintiffs, the medical community, and the

public were unqualified statements made to induce Plaintiffs and Mrs. Zelaski's physicians

to purchase and use the Durom Cup; and Plaintiffs and Mrs. Zelaski's physicians relied upon

the statements when purchasing the devices and having them implanted in her body.

148.    Defendants took unconscionable advantage of their dominant position of

knowledge with regard to Plaintiffs and engaged in constructive fraud in their relationship

with Plaintiffs. Plaintiffs reasonably relied on Defendants' representations.

149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

sustained and will continue to sustain severe physical injuries, economic losses and other

damages for which they are entitled to compensatory and equitable damages and declaratory

relief in an amount to be proven at trial.

**COUNT XI**

**(Negligent Infliction Of Emotional Distress)**

150.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully

set forth herein.

151.    Defendants carelessly and negligently manufactured, marketed and sold the

Durom Cup to Plaintiffs, carelessly and negligently concealed the Durom Cup defects from

Plaintiffs, and carelessly and negligently misrepresented the quality, safety and usefulness of

the Durom Cup.

152.    Plaintiffs were directly involved in and directly impacted by Defendants'

carelessness and negligence, in that Plaintiffs have sustained and will continue to sustain

severe physical injuries, economic losses, and other damages as a direct result of their (and

Mrs. Zelaski's physicians') decision to purchase, use and have implanted in Mrs. Zelaski's

hip a defective and dangerous product manufactured, sold and distributed by Defendants.

153.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

suffered injuries, damages and harm detailed herein, for which they are entitled to

compensatory damages in an amount to be proven at trial

**COUNT XII**

**LOSS OF CONSORTIUM**
**AGAINST ALL DEFENDANTS**

154.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every

allegation set forth in the preceding paragraphs and further alleges as follows:

155.    Plaintiff Daniel Zelaski was at all times relevant hereto the spouse of Plaintiff

Kathleen Zelaski and lived and cohabitated with her at the time of Mrs. Zelaski's injuries, and now.

156.   Mr. Zelaski has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

157.   Mr. and Mrs. Zelaski have been caused, presently and in the future, to suffer the loss of each other's companionship, services, sexual relations, moral support, solace, and society, and the ability of the married couple has in those respects been impaired and depreciated, and the marital association between husband and wife has been altered, and, accordingly, has been caused great mental anguish.

158.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs sustained and will continue to sustain economic losses, loss of services and other damages for which they are entitled to compensatory damages in an amount to be proven at trial.

## COUNT XIII

### (Punitive Damages)

159.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

160.   The acts of Zimmer were willful and wanton, malicious, and showed a total disregard for human life and human suffering. Based upon the acts alleged herein, Zimmer knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and damage. Zimmer continued such conduct with malice and/or in reckless disregard of the consequences, from which malice may be inferred. The Plaintiffs should be awarded punitive damages against Zimmer, based upon the acts herein so as to punish Zimmer and deter similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.      Economic and non-economic damages in an amount in excess of $75,000

as provided by law and to be supported by the evidence at trial;

2.      For compensatory damages according to proof;

3.      For loss of consortium damage;

4.      For punitive damages;

5.      For disgorgement of profits;

6.      For an award of attorneys' fees and costs;

7.      For prejudgment interest and the costs of suit; and

8.      For such other and further relief as this Court may deem just and

proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable in this civil action, as

provided by Rule 38(b) of the Federal Rules of Civil Procedure.

DATED:  June 18, 2015

/s/Daniel R. Lapinski
Daniel R. Lapinski
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive
Suite 900
Woodbridge, NJ  07095
Tele.:  (732) 636-8000
Fax:    (732) 726-4735
dlapinski@wilentz.com

*Attorneys for Plaintiffs*